1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit 12  corporation | No.  2:11-cv-01456-MCE-KJN |
| 13           Plaintiff, | **MEMORANDUM AND ORDER** |
| 14      v. | |
| 15  MATHESON TRI-GAS, INC., a Delaware corporation; BRENT 16  KRIEGER, an individual, and JAMES MURPHREE, an individual, 17 | |
| 18           Defendants. | |

19

20       In this action for violation of the Federal Water Pollution Control Act, 33 U.S.C.

21 § 1251, et seq. (hereinafter referred as the "Clean Water Act"), Plaintiff  California

22 Sportfishing Protection Alliance ("Plaintiff") alleged that, beginning as early as October 1,

23 1992, Defendant Matheson Tri-Gas Inc. and two of its employees responsible for the

24 operation and maintenance of the Matheson facility, Defendants Brent Krieger and

25 James Murphree (collectively "Defendants"), repeatedly discharged pollution

26 contaminated storm water from the facility into waterways flowing into the Sacramento

27 River and the Sacramento-San Joaquin Delta.

28 ///

1    On January 25, 2013, two days after Defendants had filed a motion for summary

2    judgment, Plaintiff moved to voluntarily dismiss this action, with prejudice.  According to

3    Plaintiff, it had decided that maintaining the lawsuit was prohibitively expensive, and that

4    its limited resources would be better spent "pursuing higher priority violators" elsewhere.

5    The Court thereafter granted Plaintiff's Motion to Dismiss, with prejudice, and granted

6    judgment in Defendants' favor on February 25, 2013.

7    Defendants now seek to recover attorneys' fees, expert witness fees and litigation

8    expenses in the amount of $411,555.90, pursuant to § 1365(d) of the Clean Water Act,

9    as well as Federal Rule of Civil Procedure 54(d)(2).

10

11    **ANALYSIS**

12

13    The Clean Water Act provides that the Court can award costs of litigation,

14    including reasonable attorney and expert witness fees, to any prevailing or substantially

15    prevailing party whenever it determines that such an award is appropriate.  33 U.S.C.

16    § 1365(d).  Additionally, Federal Rule of Civil Procedure 54(d)(2)  allows the prevailing

17    party to move for attorney's fees and other nontaxable expenses[1] within 14 days

18    following the entry of judgment, which Defendants did here.

19    Prevailing party status requires that a party obtain a judgment on the merits.  See

20    Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health & Human Res.,

21    532 U.S. 598, 600 (2001).  "The phrase 'final judgment on the merits' is often used

22    interchangeably with 'dismissal with prejudice.'"  Stewart v. United States Bancorp.

23    297 F.3d 953, 956 (9th Cir. 2002).   It is undisputed that Defendants are prevailing

24    parties under this analysis.

25    That fact alone, however, is not determinative in awarding fees to Defendants as

26    successful Clean Water Act litigants.

27    [1] Defendants have also submitted a Bill of Costs in the amount of $11,080.69 for taxable costs under Eastern District Local Rule 292 and 28 U.S.C. § 1920.  The propriety of those costs will be

28    determined by separate order.

2

1    Instead, such an award is proper only where the plaintiff's action was "frivolous,

2    unreasonable, or without foundation."  Razore v. Tulalip Tribes, 66 F.3d 236, 240 (9th

3    Cir. 1995) (holding that the frivolousness standard set forth by the Supreme Court in

4    Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n, 434 U.S. 412,

5    421-22 (1978)  governs fee requests by defendants under the Clean Water Act); Morris-

6    Smith v. Moulton Niguel Water Dist., 44 F. Supp. 2d 1084, 1086 (C.D. Cal. 1999), aff'd,

7    234 F.3d 1277 (9th Cir. 2000) (also applying the so-called Christiansburg standard in

8    assessing a fee award to a prevailing defendant in a Clean Water Act case).

9           Under the Christiansburg standard, the terms "frivolous," "unreasonable" and

10   "without foundation" are essentially interchangeable.  Thomas v. Bible, 983 F.2d 152,

11   154, n.2 (9th Cir. 1993).  A case is frivolous when: 1) it is so lacking in arguable merit as

12   to be groundless or without foundation; when 2) the result is obvious, or when 3) the

13   plaintiff continues to litigate after the matter clearly becomes frivolous.  See Karam v.

14   City of Burbank, 352 F.3d 1188, 1195 (9th Cir. 2003).  In deciding whether a claim is

15   frivolous, the court must first "assess the claim at the time the complaint was filed."

16   Tutor-Saliba Corp. v. City of Hailey, 452 F.3d 1055, 1060 (9th Cir. 2006).

17          Defendants here argue that Plaintiff's case was in fact "frivolous and meritless

18   from its inception," and that Plaintiff additionally continued to prosecute the action even

19   after obtaining evidence that the case "totally and completely lacked merit, and that

20   Plaintiff lacked any prima facie support for its claims whatsoever.  Defs.' Mot., 1:12-15.

21   Defendants accordingly contend that they are entitled to fees under Christiansburg.

22          According to Defendants, Plaintiff's First through Third Causes of Action are all

23   premised upon the discharge of contaminated storm water exceeding EPA benchmark

24   guidelines.  Defendants take that position because such exceedances cannot be the

25   sole support for viable Clean Water Act claims all three causes of action were

26   necessarily without merit.

27   ///

28   ///

3

1    In addition, because Defendants assert that the Fourth and Fifth Causes of action were

2    based on improper and inadequate precipitation data as well as other unsupported

3    allegations with respect to Defendant's monitoring program, those claims were also

4    fatally flawed.  Given these fundamental shortcomings, Defendants assert they are

5    entitled to their fees and costs for having to defend Plaintiff's frivolous claims.

6         Defendants further claim that discovery subsequent to the institution of Plaintiff's

7    complaint also produced "ample documentation" that they complied with the Clean

8    Water Act, which make Plaintiff's continued prosecution of its case also frivolous and

9    meriting the award of fees and costs on that basis as well.  Defendants' arguments in

10   this regard are based in large part on a post-filing Regional Board Inspection report

11   indicating that Defendants Storm Water Pollution Prevention Plan ("SWPPP") was

12   "generally complete."  Defendants also rely on documents they produced on June 22,

13   2012, also after this lawsuit was filed, which they claim "demonstrate that naturally

14   occurring substances, not industrial activities from the Matheson facility, caused the

15   benchmark exceedances of which Plaintiff complained."  Defs.' Moving Papers, 4:12-25.

16        Although Defendants correctly point out that Baykeeper v. Kramer Metals, Inc.,

17   619 F. Supp. 2d 914 (C.D. Cal. 2009) finds that exceedances of benchmark guidance

18   values are not conclusive evidence of Clean Water Act violations (Id. at 923-24), Plaintiff

19   alleges that those exceedances were only part of the evidence it had of Defendants'

20   violations.  According to Plaintiff's counsel Andrew Packard, Plaintiff began the process

21   of assessing Defendants' compliance with the Clean Water Act, as well as California's

22   General Permit (which is designed to regulate industrial storm water discharges) some

23   six months before the instant lawsuit was filed.

24   ///

25   ///

26   ///

27   ///

28   ///

4

1    Mr. Packard states that this investigation entailed "an exhaustive review of the

2    entire public file retained by the Central Valley Regional Water Quality Control Board"

3    concerning Defendants efforts to comply both with the Clean Water Act and the General

4    Permit.  Packard Decl., ¶ 2.[2]  That review included an analysis of Defendants' Annual

5    Reports submitted pursuant to the General Permit, dating back to approximately 2005.

6    Defendants' own data contained in those reports showed, during the five wet seasons

7    prior to the filing of complaint, storm water discharges exceeding benchmark numbers:

8    1) for total suspended solids seven times; 2) for iron 11 times (sometimes by as much as

9    17 times the benchmark limit); and 3) for aluminum 14 times, sometimes by as much as

10   13 times the benchmark limit.  Id. at ¶ 4.  Moreover, the Regional Board's Annual Report

11   Review Checklist gave a "fail" rating to Defendants' Reports during that time period.  Id.

12   at ¶ 6.  In addition to exceedances, the various annual reports showed incomplete data

13   submission, failure to conduct monthly observations, and failure to provide lab data as

14   required by the General Permit.  In both 2009 and 2010, the Regional Board assigned

15   Defendants the highest priority rating ("Pink-High) for specific benchmark exceedances.

16   Id. at ¶¶ 7-11.  The 2008, 2009 and 2010 report failed to provide any explanation for

17   those exceedances.  Id. at ¶¶ 9-11.

18       Significantly, too, Plaintiff reviewed March 30, 2007 and October 23, 2009 letters

19   from the Regional Board indicating that Best Management Practices ("BMPs") were not

20   adequate in reducing pollutant concentrations.

21   ///

22   ///

23   ///

24

25   [2] The Court notes that Defendants have interposed numerous objections to both Andrew
Packard's declaration and the Declaration of Steven Bond, discussed infra.  Those objections are
overruled.   The content of the declarations is plainly relevant. In addition, to the extent Defendants assert

26   hearsay objections, the Court finds that the various findings and investigative results reported within the
declarations were not offered to prove the truth of the matter asserted, but rather to show the declarants'

27   state of mind in establishing due diligence with respect to the viability of Plaintiff's claims, both before and
after the instant lawsuit was commenced.  Additionally, because experts had not even been disclosed at
the time this action was dismissed, Plaintiff's objection that Mr. Bond was not disclosed as an expert lacks

28   merit.

1    Plaintiff also reviewed a November 23, 2009 letter from Defendants  to the Regional

2    Board conceding that  Defendants had exceeded US EPA benchmark values for each

3    Annual Report since 2004, and identifying "metal debris from materials storage" as the

4    sole source of pollutants contributing to Defendants' aluminum and iron benchmark

5    exceedances.  Id. at ¶ 13.  That assertion is at odds with Defendants' later claims that

6    the elevated pollutants came only from naturally occurring sources and had nothing to

7    do with Defendants' activities on the site.

8        In addition to Plaintiff's review of the Regional Board's file as described above,

9    which revealed not only significant benchmark exceedances but also other apparent

10    General Permit violations, Plaintiff also had its expert, Steven Bond, conduct a site visit

11    to Defendant's facility on September 22, 2011, shortly after Plaintiff's lawsuit was filed.

12    Mr. Bond's subsequent report identified industrial activities that potentially caused and/or

13    contributed to the storm water pollution that could be mitigated through more effective

14    BMPs.  Mr. Bond further identified deficiencies in Defendant's SWPPP and deficiencies

15    in Defendants' monitoring report.  According to Plaintiff's counsel, Mr. Bond's report

16    confirmed his belief that Plaintiff's causes of action had evidentiary support and

17    continued to have merit.  Id. at ¶ 20.

18        Although Defendants contended that any pollutant discharge at the facility was

19    "naturally occurring" and therefore not subject to control, Steven Bond told Plaintiff's

20    counsel that he did not believe that this "naturally occurring" theory had any scientific or

21    regulatory basis.   Bond Decl., ¶ 9.  In his declaration, Mr. Bond explains in detail why

22    he believed the theory to be misplaced.  Id. at 11-16.  He believed, on the other hand,

23    that the total suspended solids discharged from the facility were the result of erosion

24    caused by exposed, unpaved portions of the facility that, in turn, caused the fill material

25    on which the facility was constructed to become dislocated and wash away in storm

26    water runoff.  Bond opined that BMPs could minimize erosion through paving area of

27    heavy vehicular traffic or by routing traffic around areas subject to erosion.  Id. at 18-19.

28    ///

1    Clearly, the parties' respective experts strongly disagree on the cause of the

2    pollutant discharge.  This Court cannot conclude that Mr. Bond's opinions were totally

3    without merit, particularly in the context of determining whether Plaintiff had any basis for

4    pursuing this lawsuit.  Of note in this regard is the fact that the Regional Water Board

5    subsequently concluded, in a letter to Defendants dated September 4, 2013, that even if

6    the pollutants were not derived from the industrial processes at the site there was still no

7    monitoring or corrective exemption under the General Permit for natural discharges.

8    See Plaintiff's Request for Judicial Notice, ECF No. 79, Ex. A.[3]  That conclusion is

9    consistent with Steven Bond's expert opinion that there was no regulatory basis for

10   Defendant's naturally occurring theory.

11       Nor does the fact that the Regional Board subsequently found, in its March 14,

12   2012 inspection of the facility, that Defendants' New SWPPP was "generally complete,"

13   necessarily mean that it was legally adequate, particularly since the report continued to

14   recommend implementation of additional BMPs.

15       Defendants fare no better in arguing that Plaintiff's Fourth and Fifth Causes of

16   Action, which are predicated on deficiencies in Defendants' storm water monitoring

17   program, were fatally flawed.  First, with respect to the accuracy of rainfall data, data

18   was taken from a precipitation gauge in Vacaville, the closest publicly available

19   monitoring station to Defendants' facility.   That data suggested samples of qualifying

20   storm events were not properly taken on a number of occasions between 2005 and

21   2009.  See Packard Decl., ¶ 29.  Steven Bond's declaration goes on to explain that he

22   reviewed rainfall records for the three weather stations surrounding defendants' facility

23   for the period between March 24, 2006 and March 26, 2011.

24   ///

25

26       [3] Plaintiff's judicial notice request is granted under Federal Rule of Evidence 201.  Rather than
interpose any objection to that request, Defendants filed a request for surreply.  That request is denied.
The Court also notes that both sides have also submitted additional requests for judicial notice in
27   connection with these proceedings, some of which have been opposed.  Because the objected to
materials have not been relied upon by the Court in its ruling herein, it need not rule on the objections and
28   declines to do so.  The remainder of the unopposed requests for judicial notice is granted.

1  According to Mr. Bond, multiple confirming observations from independent locations

2  reinforce confidence in the accuracy of the rainfall data and whether it triggered

3  monitoring obligations.  See Bond Decl., ¶ 24.  Additionally, even aside from the rain

4  data itself, Mr. Bond's observation of Defendants' facility showed an additional storm

5  water discharge point that had never been acknowledged in any of Defendants' General

6  Permit compliance documents.  Id. at 10.  Again, under these circumstances, the Court

7  cannot discount the potential viability of the Fourth and Fifth Causes of Action with

8  respect to Plaintiff's monitoring obligations.

9

10  **CONCLUSION**

11

12  In sum, there is insufficient information from which this Court can conclude that

13  Defendants have satisfied the stringent threshold for finding this action to be legally

14  frivolous, either at its inception or as the case continued, so as to merit the imposition of

15  an award of attorney's fees against Plaintiff.  Contrary to Defendants' assertions, the fact

16  that Plaintiff ultimately elected to dismiss its claims given the cost of ongoing litigation

17  and in the face of Defendants' motion for summary judgment does not lead to the

18  inescapable conclusion  that Plaintiff had no basis for any of its claims and that this

19  lawsuit was, by definition, frivolous.  Defendants' Motion for Attorneys' Fees (ECF

20  No. 42) is accordingly DENIED.[4]

21  IT IS SO ORDERED.

22  Dated:  October 11, 2013

23

24

25

26  MORRISON C. ENGLAND, JR, CHIEF JUDGE
   UNITED STATES DISTRICT COURT

27

28  [4] Because oral argument was not deemed of material assistance, the Court ordered this matter submitted on the briefs.  E.D. Local Rule 230(g).

8