UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation<br><br>Plaintiff,<br><br>v.<br><br>MATHESON TRI-GAS, INC., a Delaware corporation; BRENT KRIEGER, an individual, and JAMES MURPHREE, an individual,<br><br>Defendants. | No.  2:11-cv-01456-MCE-KJN<br><br>**MEMORANDUM AND ORDER** |

In this action for violation of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, et seq. (hereinafter referred as the "Clean Water Act"), Plaintiff California Sportfishing Protection Alliance ("Plaintiff") alleged that, beginning as early as October 1, 1992, Defendant Matheson Tri-Gas Inc. and two of its employees responsible for the operation and maintenance of the Matheson facility, Defendants Brent Krieger and James Murphree (collectively "Defendants"), repeatedly discharged pollution contaminated storm water from the facility into waterways flowing into the Sacramento River and the Sacramento-San Joaquin Delta.

///

On January 25, 2013, two days after Defendants had filed a motion for summary judgment, Plaintiff moved to voluntarily dismiss this action, with prejudice. According to Plaintiff, it had decided that maintaining the lawsuit was prohibitively expensive, and that its limited resources would be better spent "pursuing higher priority violators" elsewhere. The Court thereafter granted Plaintiff's Motion to Dismiss, with prejudice, and granted judgment in Defendants' favor on February 25, 2013.

Defendants now seek to recover attorneys' fees, expert witness fees and litigation expenses in the amount of $411,555.90, pursuant to § 1365(d) of the Clean Water Act, as well as Federal Rule of Civil Procedure 54(d)(2).

## ANALYSIS

The Clean Water Act provides that the Court can award costs of litigation, including reasonable attorney and expert witness fees, to any prevailing or substantially prevailing party whenever it determines that such an award is appropriate. 33 U.S.C. § 1365(d). Additionally, Federal Rule of Civil Procedure 54(d)(2) allows the prevailing party to move for attorney's fees and other nontaxable expenses[1] within 14 days following the entry of judgment, which Defendants did here.

Prevailing party status requires that a party obtain a judgment on the merits. See Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health & Human Res., 532 U.S. 598, 600 (2001). "The phrase 'final judgment on the merits' is often used interchangeably with 'dismissal with prejudice." Stewart v. United States Bancorp. 297 F.3d 953, 956 (9th Cir. 2002). It is undisputed that Defendants are prevailing parties under this analysis.

That fact alone, however, is not determinative in awarding fees to Defendants as successful Clean Water Act litigants.

---

[1] Defendants have also submitted a Bill of Costs in the amount of $11,080.69 for taxable costs under Eastern District Local Rule 292 and 28 U.S.C. § 1920. The propriety of those costs will be determined by separate order.

Instead, such an award is proper only where the plaintiff's action was "frivolous, unreasonable, or without foundation." Razore v. Tulalip Tribes, 66 F.3d 236, 240 (9th Cir. 1995) (holding that the frivolousness standard set forth by the Supreme Court in Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n, 434 U.S. 412, 421-22 (1978) governs fee requests by defendants under the Clean Water Act); Morris-Smith v. Moulton Niguel Water Dist., 44 F. Supp. 2d 1084, 1086 (C.D. Cal. 1999), aff'd, 234 F.3d 1277 (9th Cir. 2000) (also applying the so-called Christiansburg standard in assessing a fee award to a prevailing defendant in a Clean Water Act case).

Under the Christiansburg standard, the terms "frivolous," "unreasonable" and "without foundation" are essentially interchangeable. Thomas v. Bible, 983 F.2d 152, 154, n.2 (9th Cir. 1993). A case is frivolous when: 1) it is so lacking in arguable merit as to be groundless or without foundation; when 2) the result is obvious, or when 3) the plaintiff continues to litigate after the matter clearly becomes frivolous. See Karam v. City of Burbank, 352 F.3d 1188, 1195 (9th Cir. 2003). In deciding whether a claim is frivolous, the court must first "assess the claim at the time the complaint was filed." Tutor-Saliba Corp. v. City of Hailey, 452 F.3d 1055, 1060 (9th Cir. 2006).

Defendants here argue that Plaintiff's case was in fact "frivolous and meritless from its inception," and that Plaintiff additionally continued to prosecute the action even after obtaining evidence that the case "totally and completely lacked merit, and that Plaintiff lacked any prima facie support for its claims whatsoever. Defs.' Mot., 1:12-15. Defendants accordingly contend that they are entitled to fees under Christiansburg.

According to Defendants, Plaintiff's First through Third Causes of Action are all premised upon the discharge of contaminated storm water exceeding EPA benchmark guidelines. Defendants take that position because such exceedances cannot be the sole support for viable Clean Water Act claims all three causes of action were necessarily without merit.

///

///

3

1  In addition, because Defendants assert that the Fourth and Fifth Causes of action were
2  based on improper and inadequate precipitation data as well as other unsupported
3  allegations with respect to Defendant's monitoring program, those claims were also
4  fatally flawed.  Given these fundamental shortcomings, Defendants assert they are
5  entitled to their fees and costs for having to defend Plaintiff's frivolous claims.
6         Defendants further claim that discovery subsequent to the institution of Plaintiff's
7  complaint also produced "ample documentation" that they complied with the Clean
8  Water Act, which make Plaintiff's continued prosecution of its case also frivolous and
9  meriting the award of fees and costs on that basis as well.  Defendants' arguments in
10 this regard are based in large part on a post-filing Regional Board Inspection report
11 indicating that Defendants Storm Water Pollution Prevention Plan ("SWPPP") was
12 "generally complete."  Defendants also rely on documents they produced on June 22,
13 2012, also after this lawsuit was filed, which they claim "demonstrate that naturally
14 occurring substances, not industrial activities from the Matheson facility, caused the
15 benchmark exceedances of which Plaintiff complained."  Defs.' Moving Papers, 4:12-25.
16        Although Defendants correctly point out that Baykeeper v. Kramer Metals, Inc.,
17 619 F. Supp. 2d 914 (C.D. Cal. 2009) finds that exceedances of benchmark guidance
18 values are not conclusive evidence of Clean Water Act violations (Id. at 923-24), Plaintiff
19 alleges that those exceedances were only part of the evidence it had of Defendants'
20 violations.  According to Plaintiff's counsel Andrew Packard, Plaintiff began the process
21 of assessing Defendants' compliance with the Clean Water Act, as well as California's
22 General Permit (which is designed to regulate industrial storm water discharges) some
23 six months before the instant lawsuit was filed.
24 ///
25 ///
26 ///
27 ///
28 ///

Mr. Packard states that this investigation entailed "an exhaustive review of the entire public file retained by the Central Valley Regional Water Quality Control Board" concerning Defendants efforts to comply both with the Clean Water Act and the General Permit. Packard Decl., ¶ 2.[2] That review included an analysis of Defendants' Annual Reports submitted pursuant to the General Permit, dating back to approximately 2005. Defendants' own data contained in those reports showed, during the five wet seasons prior to the filing of complaint, storm water discharges exceeding benchmark numbers: 1) for total suspended solids seven times; 2) for iron 11 times (sometimes by as much as 17 times the benchmark limit); and 3) for aluminum 14 times, sometimes by as much as 13 times the benchmark limit. Id. at ¶ 4. Moreover, the Regional Board's Annual Report Review Checklist gave a "fail" rating to Defendants' Reports during that time period. Id. at ¶ 6. In addition to exceedances, the various annual reports showed incomplete data submission, failure to conduct monthly observations, and failure to provide lab data as required by the General Permit. In both 2009 and 2010, the Regional Board assigned Defendants the highest priority rating ("Pink-High) for specific benchmark exceedances. Id. at ¶¶ 7-11. The 2008, 2009 and 2010 report failed to provide any explanation for those exceedances. Id. at ¶¶ 9-11.

Significantly, too, Plaintiff reviewed March 30, 2007 and October 23, 2009 letters from the Regional Board indicating that Best Management Practices ("BMPs") were not adequate in reducing pollutant concentrations.

///

///

///

---

[2] The Court notes that Defendants have interposed numerous objections to both Andrew Packard's declaration and the Declaration of Steven Bond, discussed infra. Those objections are overruled. The content of the declarations is plainly relevant. In addition, to the extent Defendants assert hearsay objections, the Court finds that the various findings and investigative results reported within the declarations were not offered to prove the truth of the matter asserted, but rather to show the declarants' state of mind in establishing due diligence with respect to the viability of Plaintiff's claims, both before and after the instant lawsuit was commenced. Additionally, because experts had not even been disclosed at the time this action was dismissed, Plaintiff's objection that Mr. Bond was not disclosed as an expert lacks merit.

Plaintiff also reviewed a November 23, 2009 letter from Defendants to the Regional Board conceding that Defendants had exceeded US EPA benchmark values for each Annual Report since 2004, and identifying "metal debris from materials storage" as the sole source of pollutants contributing to Defendants' aluminum and iron benchmark exceedances. Id. at ¶ 13. That assertion is at odds with Defendants' later claims that the elevated pollutants came only from naturally occurring sources and had nothing to do with Defendants' activities on the site.

In addition to Plaintiff's review of the Regional Board's file as described above, which revealed not only significant benchmark exceedances but also other apparent General Permit violations, Plaintiff also had its expert, Steven Bond, conduct a site visit to Defendant's facility on September 22, 2011, shortly after Plaintiff's lawsuit was filed. Mr. Bond's subsequent report identified industrial activities that potentially caused and/or contributed to the storm water pollution that could be mitigated through more effective BMPs. Mr. Bond further identified deficiencies in Defendant's SWPPP and deficiencies in Defendants' monitoring report. According to Plaintiff's counsel, Mr. Bond's report confirmed his belief that Plaintiff's causes of action had evidentiary support and continued to have merit. Id. at ¶ 20.

Although Defendants contended that any pollutant discharge at the facility was "naturally occurring" and therefore not subject to control, Steven Bond told Plaintiff's counsel that he did not believe that this "naturally occurring" theory had any scientific or regulatory basis. Bond Decl., ¶ 9. In his declaration, Mr. Bond explains in detail why he believed the theory to be misplaced. Id. at 11-16. He believed, on the other hand, that the total suspended solids discharged from the facility were the result of erosion caused by exposed, unpaved portions of the facility that, in turn, caused the fill material on which the facility was constructed to become dislocated and wash away in storm water runoff. Bond opined that BMPs could minimize erosion through paving area of heavy vehicular traffic or by routing traffic around areas subject to erosion. Id. at 18-19.

///

Clearly, the parties' respective experts strongly disagree on the cause of the pollutant discharge. This Court cannot conclude that Mr. Bond's opinions were totally without merit, particularly in the context of determining whether Plaintiff had any basis for pursuing this lawsuit. Of note in this regard is the fact that the Regional Water Board subsequently concluded, in a letter to Defendants dated September 4, 2013, that even if the pollutants were not derived from the industrial processes at the site there was still no monitoring or corrective exemption under the General Permit for natural discharges. See Plaintiff's Request for Judicial Notice, ECF No. 79, Ex. A.[3] That conclusion is consistent with Steven Bond's expert opinion that there was no regulatory basis for Defendant's naturally occurring theory.

Nor does the fact that the Regional Board subsequently found, in its March 14, 2012 inspection of the facility, that Defendants' New SWPPP was "generally complete," necessarily mean that it was legally adequate, particularly since the report continued to recommend implementation of additional BMPs.

Defendants fare no better in arguing that Plaintiff's Fourth and Fifth Causes of Action, which are predicated on deficiencies in Defendants' storm water monitoring program, were fatally flawed. First, with respect to the accuracy of rainfall data, data was taken from a precipitation gauge in Vacaville, the closest publicly available monitoring station to Defendants' facility. That data suggested samples of qualifying storm events were not properly taken on a number of occasions between 2005 and 2009. See Packard Decl., ¶ 29. Steven Bond's declaration goes on to explain that he reviewed rainfall records for the three weather stations surrounding defendants' facility for the period between March 24, 2006 and March 26, 2011.

///

---

[3] Plaintiff's judicial notice request is granted under Federal Rule of Evidence 201. Rather than interpose any objection to that request, Defendants filed a request for surreply. That request is denied. The Court also notes that both sides have also submitted additional requests for judicial notice in connection with these proceedings, some of which have been opposed. Because the objected to materials have not been relied upon by the Court in its ruling herein, it need not rule on the objections and declines to do so. The remainder of the unopposed requests for judicial notice is granted.

According to Mr. Bond, multiple confirming observations from independent locations reinforce confidence in the accuracy of the rainfall data and whether it triggered monitoring obligations.  See Bond Decl., ¶ 24.  Additionally, even aside from the rain data itself, Mr. Bond's observation of Defendants' facility showed an additional storm water discharge point that had never been acknowledged in any of Defendants' General Permit compliance documents.  Id. at 10.  Again, under these circumstances, the Court cannot discount the potential viability of the Fourth and Fifth Causes of Action with respect to Plaintiff's monitoring obligations.

## CONCLUSION

In sum, there is insufficient information from which this Court can conclude that Defendants have satisfied the stringent threshold for finding this action to be legally frivolous, either at its inception or as the case continued, so as to merit the imposition of an award of attorney's fees against Plaintiff.  Contrary to Defendants' assertions, the fact that Plaintiff ultimately elected to dismiss its claims given the cost of ongoing litigation and in the face of Defendants' motion for summary judgment does not lead to the inescapable conclusion  that Plaintiff had no basis for any of its claims and that this lawsuit was, by definition, frivolous.  Defendants' Motion for Attorneys' Fees (ECF No. 42) is accordingly DENIED.[4]

IT IS SO ORDERED.

Dated:  October 11, 2013

_____
MORRISON C. ENGLAND, JR, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[4] Because oral argument was not deemed of material assistance, the Court ordered this matter submitted on the briefs.  E.D. Local Rule 230(g).